**ATARI CORPORATION, a Delaware corporation, Plaintiff,**

v.

**SEGA OF AMERICA, INC., a California corporation, Defendant.**

No. C 93–03781 CW.

United States District Court, N.D. California.

Aug. 12, 1994.

Richard P. Doyle, Jr., Richard F. Trecartin, Gary S. Williams, Mitchell S. Rosenfeld, Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, CA, and Luke Ellis, Ralph L. Jacobson and Sue Hunt, Gillin, Jacobson, Ellis & Larsen, Berkeley, CA, for plaintiff.

Edward F. McKie, Jr., Banner, Birch, McKie & Beckett, Washington, DC and Joseph W. Rogers, Rogers, Joseph, O'Donnell & Quinn, San Francisco, CA, for defendant.

### ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WILKEN, District Judge.

Plaintiff's motion for preliminary injunction, to enjoin Sega, its agents, and persons in active concert with them from "making, using and/or selling [Sega's] current line of video games currently marketed under the Genesis and Game Gear trademarks, including but not limited to all software capable of

being run on these video games," was heard by this Court on July 22, 1994. Richard P. Doyle Jr., Luke Ellis, Ralph L. Jacobson and Mitchell S. Rosenfeld appeared on behalf of Plaintiff Atari. Edward McKie Jr., Neil A. Steinberg, and Nina L. Medlock appeared on behalf of Defendant Sega.

Having considered the papers filed by the parties and oral argument on the motion, and good cause not appearing for the granting of the preliminary injunction, the Court hereby DENIES the motion in all respects for the following reasons.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

This action for patent infringement concerns an apparatus for horizontal scrolling of a video display, present in Defendant Sega's video games, and U.S. Patent No. 4,445,114 ("the '114 Patent" or "the Patent"), issued April 24, 1984, and owned by Atari.

The history of the Patent is as follows. On October 3, 1980, a patent application entitled "Apparatus for Scrolling a Video Display" was filed by inventor David R. Stubben. The patented invention allowed for fine horizontal scrolling of the video display with minimal interruption of access to the memory. It achieved this by imposing a delay in the transmission of the graphics data, which had already been read out from the memory, to the display. Prior art, including Atari's own unpatented game "SuperBug," had achieved scrolling in such a way as to limit access to the memory; for example, SuperBug delayed the addressing to the memory and the read out from the memory.

The patent application was prosecuted by attorney Robert Bennett. After the initial application was approved, but before Bennett paid the fee for the patent to issue, Bennett learned of prior art not initially disclosed and not considered by the patent examiner. Bennett abandoned the initial application and filed a continuation application in order to ensure that the Patent and Trademark Office

("PTO") had a full opportunity to consider the prior art.

However, Bennett failed to disclose Atari's "SuperBug" at any time during the prosecution. Bennett has testified in other litigation that he was aware of SuperBug because Stubben's invention disclosure listed "Super-Bug schematics" as "reference material," but that he was unaware that SuperBug had been publicly disclosed and thus constituted prior art.

Bennett testified that he inquired about the reference to SuperBug and was provided with a copy of the draft SuperBug patent application.[1] He stated that he "reviewed" but did not read "word for word" the draft SuperBug application. He admitted that he did use portions of the SuperBug application in drafting the '114 application to "fill in the background of the invention" and "to describe the memory organization."

The draft SuperBug application is 14 pages long, excluding figures. It states at page 4 that SuperBug "is commercially sold." This is not one of the pages from which Bennett borrowed language. Bennett testified that he does not remember knowing of commercial sales, or even that there was a completed physical embodiment of SuperBug at the time he prepared the '114 application. He testified that he saw a SuperBug game "in the labs … with boards hanging out, scopes hanging on it, and wires protruding," but could not recall when he saw this.

In January 1989, Atari sued another competitor, Nintendo, for infringement of the '114 Patent. In 1991, in conjunction with that litigation, both Atari and Nintendo requested that the patent examiner reexamine the Patent in light of the previously undisclosed prior art of the SuperBug manual. The PTO agreed to carry out the reexamination because the SuperBug manual raised "a substantial new question of patentability."

On reexamination, based on the SuperBug manual, and additionally on a detailed description of the manual's schematic diagrams submitted by Atari, the patent examiner ini-

---

1. Apparently Atari had sought to patent Super-Bug but failed to file its patent application within one year of its commercialization, thus rendering it unpatentable. Another attorney in Bennett's firm handled the SuperBug patent. There is no evidence that Bennett knew that SuperBug had missed its opportunity to be patented.

tially rejected all patent claims. However, in prosecution, Atari demonstrated to the satisfaction of the patent examiner that SuperBug did not disclose a critical element of the Patent, that of a "delay means" positioned between the memory and the display means. The PTO confirmed all claims of the Patent.

Nintendo requested a second reexamination in 1992, and the PTO again confirmed the Patent without amendment. The Nintendo litigation was then settled, with Atari conferring on Nintendo a royalty free license to use the '114 Patent in exchange for valuable consideration.

In the meantime, on March 22, 1990, Atari informed Sega of its belief that Sega was infringing the '114 Patent. Settlement discussions ensued but were unsuccessful. This action was filed in October 1993. Again, settlement discussions ensued, and again they failed.

In the meantime, in November 1993 Atari released new video game hardware called "Jaguar," which does not use the '114 Patent technology. Jaguar is more powerful and more expensive than the hardware sold by Atari and Nintendo, costing approximately $250.00, as compared to approximately $90.00 for Sega's Game Gear or Genesis. Jaguar has not been very successful. Atari claims that this is due to the market saturation and domination of video game hardware sold by Sega and Nintendo. Atari further claims that unless Sega is enjoined from continuing its alleged infringement, Atari will continue to be unable to get retail shelf space for Jaguar, to Atari's irreparable harm.

Sega contends that Jaguar does not directly compete with Sega's products, and that if Sega is enjoined, no benefit will redound to Atari. Sega further contends that if it is enjoined from making and selling all of its products, it will be forced out of business, and that third parties who produce software for use on its platforms and retailers will also be economically harmed.

## II. STANDARD FOR PRELIMINARY INJUNCTION

■ Injunctive relief in patent cases is statutorily authorized by 35 U.S.C. § 283.

On a motion for preliminary injunction, Plaintiff must show: (A) a reasonable likelihood that it will succeed on the merits, (B) that irreparable injury will result if the injunction is not granted, (C) that the balance of hardships weighs in plaintiff's favor, and (D) that the granting of the injunction will not disserve the public interest. *Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446 (Fed.Cir.1987).

## III. DISCUSSION

### A. Reasonable Likelihood of Success

■ To determine reasonable likelihood of success, the court must determine whether the patent is likely to be found valid and enforceable and whether the accused device is likely to be found to infringe upon the patent. Both inquiries require a determination of the meaning and scope of the claim in suit. *Lemelson v. General Mills,* 968 F.2d 1202, 1206 (Fed.Cir.1992).

#### 1. Meaning and scope of claim in suit

Defendant contends that the portion of the claim stated in the Patent as a "delay means for selectively delaying communication of the graphics data in the memory means to the display" must be construed to be limited to a delay means which is positioned in the data stream after the parallel-to-serial converter. Defendant bases this contention on the prosecution history in the reexamination. In distinguishing the '114 Patent from SuperBug, Atari argued as follows:

The delay means in the '114 patent is clearly shown as a circuit which (1) receives the serial output *data* from parallel-to-serial converter connected to the output of the symbol ROM; (2) converts the serial *data* back to parallel *data* in a serial-to-parallel converter; and (3) selects one of the taps of the serial-to-parallel converter (via a multiplexer) and provides the data on the selected tap as output *data*. It can thus be seen that the claimed "delay means" is positioned *between* the output of the ROM and the display means and operates upon the *data* to selectively delay the *data from the memory* .... The Examiner's proposed delay means in the Super-Bug system is *not* positioned *between* the

ROM and the display, nor does it *operate upon the data*. Rather, the Examiner's proposed delay means is positioned *before* the memory circuits and operates to offset the *addresses* to the memory circuits.... In short, the Examiner has ignored the *location* of the delay means which is clearly defined in the claims.

Exhibit H to Supplemental Declaration of Luke Ellis in Support of Motion for Preliminary Injunction, pages 13–14 (emphasis in original). Defendant's argument is based on selectively quoting only the first sentence of Atari's reexamination argument. However, that sentence merely describes the structure of the "delay means" disclosed in the Patent to aid its explanation of the claim. The following sentences contain the actual explanation and limitation of the meaning of the "delay means" language of the claim, which is that the delay means must be positioned in the data stream between the memory and the display so as to operate on the data. The Court therefore rejects Defendant's construction.

### 2. *Validity*

■ A patent is presumed to be valid, and the presumption must be overcome by clear and convincing evidence. 35 U.S.C. § 282. Where there is no other evidence of invalidity than the prior art already considered by the patent office, the challenging party must in addition overcome the deference accorded the patent examiner, whose duty it is to issue only valid patents, and who is presumed to have properly done his or her job, to have expertise in interpreting the references, and to be familiar with the level of skill in the art. *American Hoist & Derrick Co. v. Sowa & Sons Inc.*, 725 F.2d 1350, 1359 (Fed.Cir. 1984), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

■ On a motion for preliminary injunction, the alleged infringer must come forward with clear and convincing evidence of defenses to the patent. If it does so, the burden then shifts to the patent owner to show that it is likely to overcome those defenses, that is, to show that the challenges to the patent lack substantial merit. *New England Braid-*

*ing Co. v. AW Chesterson Co.*, 970 F.2d 878, 883 (Fed.Cir.1992).

■ In the instant case, Defendant does not come forward with any argument or evidence of invalidity. Defendant argues only that Plaintiff has not conclusively demonstrated validity by its showing that the Patent was confirmed on reexamination over all known prior art and that Nintendo accepted a license under the Patent. However, as Defendant has made no showing to overcome the presumption of validity, which is strengthened by the PTO's consideration of all prior art, the presumption is sufficient at this stage to find that the Patent is likely to be found valid.

### 3. *Infringement*

■ In a "means-plus-function" claim, "literal infringement" is found where the accused device (A) performs the identical function claimed for the means element and (B) performs that function using either the structure disclosed in the patent specification or an equivalent structure. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988); *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 841 (Fed.Cir.1991).

### a. *Identical function*

Plaintiff provides convincing expert testimony that Sega's products perform the identical function claimed in the Patent, in that the Sega devices achieve fine scrolling by placing delay means in the data stream between the memory and the display. Defendant argues that there is no literal infringement of the properly interpreted claim language because Sega's products impose the delay *before* the data is shifted through the parallel-to-serial converter rather than *after*. However, because the Court rejects Sega's claim interpretation and finds that the '114 Patent is not limited to delay means positioned after the parallel-to-serial converter, this argument fails. Plaintiff is likely to prove that Sega's products perform the identical function claimed in the Patent.

### b. *Equivalent structure*

It is undisputed that Sega's products implement fine scrolling with a structure that is different than that disclosed in the '114 Patent. The Patent discloses the structure of a serial-to-parallel converter plus a multiplexer, while the accused devices use the structure of latches plus a comparator or counter. However, there is a disputed issue of fact as to whether the structures are equivalent.

Defendant's expert, Dr. Nichols, opines that the structures are not equivalent because the Sega products impose the delay before the parallel-to-serial converter, while the '114 Patent structure delays the serial data stream at a point after the parallel-to-serial converter. However, he does not explain how this difference renders the structures not equivalent. Given that the function is simply to impose a delay positioned between the memory and the display, there is no apparent reason why placement of the delay before rather than after the parallel-to-serial converter is a substantial change or adds anything of significance. Plaintiff's expert, Dr. Smith, opines that the relative placement of the delay means and the parallel-to-serial converter are irrelevant, and the Court finds his opinion more persuasive.

Dr. Nichols also opines that the Sega structure is not equivalent because the control signals in its fine scrolling circuitry are generated in response to non-static data, while the '114 Patent employs static data to control the fine scrolling. Again, however, he does not explain the significance of this difference.

Dr. Smith opines that the "shift register scheme" employed by the '114 Patent specifications is equivalent to the "latch scheme" employed by the Sega products. His opinion is based on the following reasons: (A) each structure is a simple electronic circuit; (B) variable delays are old in the art; (C) the "shift register scheme" and the "latch scheme" are described as alternatives for providing the function of variable delay in a 1987 technical textbook (Harold Stone, "High Performance Computer Architecture, Addison–Wesley, 1987); (D) the allegedly infringing latch scheme is described as a means for providing a variable delay in a 1981 text (Peter Kogge, "The Architecture of Pipelined Computers," McGraw–Hill, 1981); and (E) with suitable modifications of the circuits for the two devices, the shift register scheme and the latch scheme are interchangeable.

■ The Court finds Dr. Smith's opinion persuasive in that its basis is logical and supported by texts. In addition, interchangeability is evidence of equivalency. *Rite–Hite Corp. v. Kelley Co. Inc.,* 819 F.2d 1120, 1124 (Fed.Cir.1987). The Court therefore finds that it is likely that Plaintiff will be able to prove the equivalency of the structures and thus show infringement.

### 4. *Unenforceability*

■ Defendant raises the equitable defense of unenforceability of the Patent due to alleged inequitable conduct before the PTO in the form of Bennett's failure to disclose SuperBug. PTO Rule 56 imposes on a patent applicant an affirmative duty to disclose material prior art. 37 C.F.R. § 1.56. Failure to do so with the intent to deceive the PTO constitutes "inequitable conduct" and can render an otherwise valid patent unenforceable. The doctrine of inequitable conduct requires a trial court first to determine whether there are at least threshold levels of both materiality of the undisclosed prior art and intent to mislead. *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991). Once such a threshold showing is made, the court balances materiality and intent; the more material the omission, the less culpable the intent required, and vice versa. *Id.* Information is material if there is "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Id.* at 1440, citing Rule 56. Intent is not presumed from the materiality of the undisclosed reference, and gross negligence does not of itself justify an inference of intent to deceive. *Id.* at 1442. Negligent conduct can support an inference of intent only when, "viewed in light of all the evidence, including evidence indicative of good faith," the conduct is so culpable as to "require a finding of intent to deceive." *Id.* at 1443, quoting *Kingsdown Medical Consul-*

*tants, Ltd. v. Hollister Inc,* 863 F.2d 867, 876 (Fed.Cir.1988), *cert. den.,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

Defendants have made at least a threshold showing that SuperBug was material to the '114 Patent application, since it contains every element of the patented invention except the element of scrolling achieved by a physical delay circuit located after the read out from the memory. SuperBug more closely resembled the patented invention than any of the other prior art considered by the PTO. This showing is further supported by the fact that upon reexamination in light of SuperBug, the examiner initially rejected all claims. The fact that the '114 Patent was ultimately issued over SuperBug does not mean that SuperBug was not material to the application.

However, Defendant has not made a threshold showing of intent to deceive the PTO. Although Bennett knew of the draft patent application for SuperBug, the draft application had not been publicly disclosed and was not prior art. It is true that had Bennett carefully read the draft patent application, he would have learned that SuperBug was being commercially sold, but his failure to read and learn this may have been mere negligence, and negligence is insufficient to support a finding of intent to deceive. This is particularly so where there is objective evidence of Bennett's good faith in prosecuting the Patent, in that he abandoned an approved claim in order to ensure PTO consideration of recently discovered prior art. Therefore, it is likely that the Patent will not be found unenforceable.

### 5. Conclusion

For the reasons stated above, the Court finds that Atari is likely to succeed on the merits in this action.

### B. Irreparable Injury

If both validity of the patent and its infringement are "clearly shown," irreparable harm is presumed. *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987). However, Atari's showing, particularly with respect to whether the accused structure is equivalent to that disclosed in the '114 Patent, is not strong enough to merit a finding that infringement has been "clearly shown." Accordingly, the presumption cannot be applied in this case. *See Nutrition 21 v. U.S.,* 930 F.2d 867 (Fed. Cir.1991).

Irreparable harm may be shown if failure to issue the injunction would erode the patent owner's market share. In the *Hybritech* case, 849 F.2d at 1456, the Federal Circuit approved the analysis of the district court, which found irreparable harm upon consideration of the following factors: that the field of technology covered by the patent was new, that there was substantial competition in the field, that the alleged infringer had a large presence in the field, that the technology changes quickly in the field, that much research was being done in the field, that the patent could help its owner establish a market position and create business relationships in the market, that by the time the litigation was finished the value of the patent might be gone because technology would have bypassed it, that the potential injury was unpredictable, and that other infringement would be encouraged in the absence of an injunction.

*Hybritech* also held that the period of delay by the patent owner prior to seeking a preliminary injunction was a relevant but not necessarily dispositive factor:

> Although a showing of delay may be so significant, in the district court's discretion, as to preclude a determination of irreparable harm, a showing of delay does not preclude, *as a matter of law,* a determination of irreparable harm. A period of delay is but one circumstance that the district court must consider in the context of the totality of the circumstances.

*Id.* at 1457 (emphasis in original). Delay is excused where the patent owner delays only in the reasonable belief that negotiations may resolve the dispute. *Jacobson v. Cox Paving Co.,* 19 U.S.P.Q.2d 1641, 1656 (D.Ariz.1991).

In the instant case, there are several indications that no irreparable harm would result from the denial of a preliminary injunction. The first is Atari's delay in asserting such harm. Sega's alleged infringement began in

1986, but Atari first accused Sega of infringement in March 1990. Even then, Atari did not demand that Sega cease and desist but suggested licensing negotiations. When those negotiations failed, Atari delayed more than three years before filing this action in October 1993. This motion for preliminary injunction was not filed until June 1994, eight months after the litigation commenced.

The second indication of lack of irreparable harm is the fact that Atari has licensed Nintendo under the Patent, rather than reserving to itself the exclusive use of the Patent. The third is the fact that Atari itself no longer uses the Patent. The fourth is that it appears likely that Sega would be able to satisfy any award of damages against it. While none of these factors precludes the possibility of finding irreparable harm, each weighs against such a finding.

Atari's attempted showing of irreparable harm consists of the declaration of economic and management expert Gene Brown. Brown declares that Atari competes in the home video game market against the two current leaders, Nintendo and Sega. There are two prime elements in this market, hardware and software. Technologically superior machines permit the development of exciting software, and the availability of exciting software fuels the sale of the machines. The market suffered in 1983 when consumers lost interest in the available software, but revived in 1986 when Nintendo introduced an 8–bit hardware system which supported more sophisticated software. Then Sega captured leadership of the market with its 16–bit system, "Genesis."

Now Atari has developed a 64–bit system, "Jaguar," but it has not captured leadership of the market. According to Brown, this is because Sega "commands the attention of software developers and desirable retail shelf space as a consequence of its large installed base and game software title availability" such that "the ability to successfully sell a sufficient quantity of Jaguars so as to attract independent software developers is seriously compromised by Sega's presence." Brown declares that because Sega and Nintendo are preparing to release 32– and 64–bit systems in 1995, Atari is in a "now or never" situation: if it does not obtain a "toehold" in the market now, it may never do so, and may not be able to survive.

Brown opines that many of the *Hybritech* factors support Atari's position in the instant case. The '114 Patent provided new technology which fueled the development of a new generation of video games. The market is highly competitive. Sega's market share is 54%, a huge market presence. There is rapid change in technology in the field. An injunction could help Atari establish a market position by giving it the opportunity to create an installed base so as to create incentive for software development. He therefore concludes that Sega's continued market presence will irreparably harm Atari.

Brown's *Hybritech* analysis is called into question by the facts that the '114 Patent technology is no longer new and that Atari no longer uses the technology. Moreover, Defendant convincingly undercuts the premise on which Atari's irreparable harm showing depends, that the issuance of an injunction against Sega would create market benefits for Atari, by presenting the declarations of the following non-party retailers of video games: Alan Fine, merchandising vice president of Kay Bee Toys; Jeffrey Griffiths, merchandise manager of the Electronics Boutique; Daniel Dematteo, president of Software, Inc.; and John Sullivan, vice president of Toys R Us.

The retailers that carry Jaguar declare that the presence or absence of Sega's products would be irrelevant to their decision on how much shelf space to give Jaguar. Griffiths declares that products of similar cost manufactured by Nintendo would get the additional shelf space; Sullivan declares that his decision would be made on the amount of sales of Jaguar, the ability of Atari to meet production schedules, and Atari's promotion and advertising support for Jaguar. Both Griffiths and Sullivan were critical of Atari's past performance in providing products on a timely basis and supporting its products with sufficient advertising.

The retailers who do not carry Jaguar do not think Sega products would be replaced with Jaguar in their stores; Dematteo cites

the unavailability of compatible software, and Fine cites lack of consumer demand. Fine also declares that Sega's and Nintendo's less expensive hardware compete directly with each other, while Atari's Jaguar competes with the more expensive hardware manufactured by 3–DO.

It is undisputed that Atari's primary problem is the lack of Jaguar-compatible software. Atari argues that Sega's dominance in the market prevents Atari from attracting independent software designers, but it makes no showing that Sega's absence from the market would enable it to attract them. Sega's showing that Nintendo, rather than Atari, is Sega's relevant competitor undermines Atari's unsupported argument. Accordingly, Atari's showing is too speculative to support a finding of the likelihood of irreparable harm, particularly in light of the factors discussed above that weigh against Atari.

### C. Balance of Hardships and Public Interest

On a motion for preliminary injunction, the Court must balance the hardships to the parties. In addition, while there exists a public interest in protecting rights secured by valid patents, the Court must inquire into whether there exists some critical public interest that would be injured by the grant of the preliminary injunction. *Hybritech,* 849 F.2d at 1458.

That the injunction would seriously harm Sega cannot be questioned, as it would be enjoined from manufacturing or selling its current line of video games. Sega presents evidence that it employs 1200 permanent and 100 temporary employees, that it would immediately terminate 85% of its employees if the injunction were to issue, and that Sega would file for bankruptcy.

Sega further presents evidence that there are 65 independent software developers and 10 independent peripheral manufacturers that design and sell software and peripherals compatible with Sega game units, 35 of which derive 50% or more of their income from sale of Sega-compatible products, that would be economically harmed by the issuance of an injunction against Sega. In addition, two retailers which sell Sega and Sega-compatible products declare that they would be economically harmed by an injunction against Sega.

Atari argues that potential harm to the infringer is not as significant a factor as potential harm to the patent owner. However, the Federal Circuit has stated that the principle that "one who elects to build a business on a product found to infringe" cannot object to an injunction is limited to a permanent injunction issued after trial and is not "remotely related to a potential destruction of [an alleged infringer] *without* its day in court." *Illinois Tool Works Inc. v. Grip–Pak Inc.,* 906 F.2d 679, 684 (Fed.Cir.1990). In addition, the harm to the independent companies must be taken into account, either in balancing the harms or in weighing the public interest.

Thus weighing the certainty of harm to Sega and the non-party retailers, software developers and peripheral manufacturers against the speculative possibility of irreparable harm to Atari, the balance tips against issuance of a preliminary injunction.

## IV. CONCLUSION

Plaintiff has failed to meet its burden on this motion for preliminary injunction. Although it is likely that Atari's Patent is valid, enforceable, and infringed by Sega, Atari does not make a sufficient showing of irreparable harm, especially in light of the countervailing factors, and the balance of hardships does not favor issuance of the injunction. Therefore, the motion is DENIED.

IT IS SO ORDERED.